UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 2:18-CV-01864 (RER)

Qudsia Hamraz and Gohlam Hamraz

versus

Diversified Maintenance Systems, LLC, and Ecolab Inc.

**MEMORANDUM & ORDER**

August 14, 2023

**RAMON E. REYES, JR., U.S.M.J.:**

Qudsia Hamraz ("Ms. Hamraz") and Gohlam Hamraz ("Mr. Hamraz") (collectively "Plaintiffs") brought this negligence and products liability action against Diversified Maintenance Systems, LLC ("Diversified") and Ecolab Inc. ("Ecolab" or "Defendant"), after Ms. Hamraz sustained second- and third-degree chemical burns upon slipping and falling into industrial floor stripper, Bright Blast, which was designed and manufactured by Ecolab and had been applied by a Diversified employee. (ECF No. 5 ("Am. Compl.")).[1] Currently before the Court is Defendant's Combined Motion to Exclude Plaintiffs' Expert Testimony and for Summary Judgment, as well as Plaintiffs' Cross-Motion for Partial Summary Judgment. (ECF No. 96). After carefully reviewing the record, and for the reasons set forth herein, Defendant's Combined Motion is granted and Plaintiffs' Cross-Motion is denied.

---

[1] The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (ECF No. 46).

1

**BACKGROUND**

I.  Facts[2]

On March 15, 2018, Ms. Hamraz arrived early to her job at a Sears store in Lake Success, New York. (ECF No. 96-2, Defendant's Rule 56.1 Statement ("Def.'s 56.1") ¶¶ 2, 18–20; ECF No. 96-23, Plaintiffs' Rule 56.1 Statement ("Pls.' 56.1") ¶¶ 2, 18–20). Ms. Hamraz was a hardline supervisor at Sears and the first person to arrive that morning. (Def.'s 56.1 ¶¶ 18–19; Pls.' 56.1 ¶¶ 18–19). She arrived early to let Eduardo Chavez ("Chavez"), an area manager for Diversified, enter the store. (Def.'s 56.1 ¶¶ 1, 20, 33; Pls.' 56.1 ¶¶ 1, 20, 33). Ms. Hamraz had been told that Chavez would be cleaning the floor where a display had been located, and the area needed time to dry before customers arrived. (Def.'s 56.1 ¶ 21; Pls.' 56.1 ¶ 21).

Shortly after Ms. Hamraz let Chavez into the building, he told her that some things in the display area still needed to be moved. (Def.'s 56.1 ¶ 22; Pls.' 56.1 ¶ 22). When Chavez directed Ms. Hamraz to move those items near the display area, he did not warn her that he had already started applying Bright Blast. (Def.'s 56.1 ¶¶ 25–26; Pls.' 56.1 ¶¶ 25–26). He also neglected to use safety cones or caution signs to mark off the area he was cleaning. (Def.'s 56.1 ¶ 38; Pls.' 56.1 ¶ 38). As such, while moving a large fixture, Ms. Hamraz slipped and fell backward into the floor stripper that Chavez had applied to the floor. (Def.'s 56.1 ¶ 26; Pls.' 56.1 ¶ 26).

Bright Blast comes in a plastic lined five-gallon box labeled with pictograms, warnings, and instructions that describe the product's hazards. (Def.'s 56.1 ¶ 9; Pls.' 56.1 ¶ 9). The label on the box states: "FOR FOOD PLANT AND INDUSTRIAL USE ONLY – NOT FOR HOUSEHOLD

---

[2] These facts are derived from Parties' Rule 56.1 statements and accepted as undisputed. *See Urena v. ConAgra Foods, Inc.*, No. 16-CV-5556 (PKC) (LB), 2020 WL 3051558, at *1 n.3 (E.D.N.Y. June 8, 2020) ("The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.").

USE." (Def.'s 56.1 ¶ 10; Pls.' 56.1 ¶ 10). Warnings on the box include statements such as: "KEEP OUT OF REACH OF CHILDREN;" "Danger;" and "Causes severe skin burns and eye damage." (Def.'s 56.1 ¶ 12; Pls.' 56.1 ¶ 12).

Chavez testified that despite his 25-years of experience with floor strippers and training on Bright Blast from his employer (Def.'s 56.1 ¶ 34; Pls.' 56.1 ¶ 34), he only diluted the product with water at a 1:5 ratio (Def.'s 56.1 ¶ 36; Pls.' 56.1 ¶ 36), even though Bright Blast is intended to be diluted with water at a ratio of 1:16 for light duty stripping and 1:6 for heavy duty stripping (Def.'s 56.1 ¶ 11; Pls.' 56.1 ¶ 11).

When Ms. Hamraz stood up from the floor after falling, she was wet with Bright Blast. (Def.'s 56.1 ¶ 29; Pls.' 56.1 ¶ 29). Chavez did not tell her what chemical she had fallen into, nor did he mention that it was corrosive or that she should wash it off immediately. (Def.'s 56.1 ¶ 29; Pls.' 56.1 ¶ 29). As such, soon after, the skin on Ms. Hamraz's shoulders, back, and buttocks began to burn from exposure, and she had to call an ambulance. (Def.'s 56.1 ¶ 31; Pls.' 56.1 ¶ 31).

II. Procedural History

Plaintiffs filed their initial Complaint on March 27, 2018, in which they named Diversified as the sole defendant. (ECF No. 1 ("Compl.")). On April 10, 2018, Plaintiffs filed an Amended Complaint adding Ecolab as a defendant. (*See generally* Am. Compl.). In their Complaint, Plaintiffs claim that Diversified and Ecolab are liable under theories of negligence and strict products liability, as well as for loss of consortium. (*Id.*). In their answer, Diversified entered a cross-claim against Ecolab. (ECF No. 13).

After unsuccessful attempts to resolve Plaintiffs' claims through motion practice, parties proceeded with discovery. (*See* ECF Order dated 6/18/2019 (terminating dispositive motions without prejudice to renewal), 1/13/2020 (setting discovery deadlines), 6/17/2020 (granting supplemental discovery schedule), 3/10/2021 (granting extension of time to complete discovery)). Subsequently, on November 9, 2021, Plaintiffs settled with and dismissed their claim against Diversified (ECF No. 83); and on November 11, 2021, Diversified discontinued its cross-claim against Ecolab (ECF No. 84).

Plaintiffs and Ecolab then set the briefing schedule for the motions presently before the Court. (ECF Order dated 1/12/2022). Following a few extensions (ECF Orders dated 3/28/2022 and 3/29/2022), Defendant filed a fully-briefed Combined Motion to Exclude Expert Testimony of Meyer R. Rosen and for Summary Judgment (ECF No. 96), Plaintiff's Cross-Motion for Partial Summary Judgment. (ECF No. 96-16), and a host of accompanying exhibits (ECF Nos. 96-1–96-26).

## DISCUSSION

I.  Admissibility of Expert Testimony

Defendant has moved to disqualify and exclude Plaintiffs' expert witness, Meyer R. Rosen ("Rosen"), for failure to adhere to the admissibility standards set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Defendant argues that Rosen is not qualified, and that his testimony is nether reliable nor relevant. (ECF No. 96-1, Ecolab Inc.'s Memorandum of Law in Support of its Combined Motion ("Def.'s Mem.") at 6–17). For the reasons set forth below, Defendant's Motion to Exclude Expert Testimony is granted.

A. Legal Standard

Pursuant to Rule 702, an expert witness may testify when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Quintanilla v. Komori Am. Corp.*, No. 07-CV-2375, 2009 WL 320186, at *1 (2d Cir. Feb. 10, 2009) (quoting Fed. R. Evid. 702). A court may only consider admissible evidence when evaluating a motion for summary judgment. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); Fed. R. Civ. P. 56(c). Thus, "[w]hen adjudicating a motion for summary judgment, a court may first need to determine the admissibility of expert testimony." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 727 (E.D.N.Y. 2016) (citing *Raskin*, 125 F.3d at 66). Courts look to the totality of a witness's qualifications to assess whether the individual is qualified as an expert "by knowledge, skill, experience, training, or education." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 667 (E.D.N.Y. 2013) (quoting Fed. R. Evid. 702). Rule 702 also demands that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The burden is on the party proffering the expert to demonstrate that the expert testimony is admissible by a preponderance of the evidence." *United States v. Raniere*, No. 18-CR-204-1 (NGG) (VMS), 2019 WL 2212639, at *6 (E.D.N.Y. May 21, 2019) (citing *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). When considering the admissibility of expert

testimony under Rule 702, "[t]he [Court's] focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

### B. Rosen's Testimony Is Not Admissible

#### a. Rosen is Qualified to Offer Testimony on Rheology but Not on Color

To establish their claim that Ms. Hamraz's injury was caused by a design defect, Plaintiffs seek to offer Rosen's testimony as a liability expert. (Def.'s 56.1 ¶ 39; Pls.' 56.1 ¶ 39). Rosen opines that "Ecolab could have formulated a safer alternative by incorporating a polymer that would 'thicken' (i.e. increase the rheological properties) so the liquid would not flow across the floor until a force was applied" and "added a coloring dye so that where it was on the floor was easily visible." (ECF No. 96-12, Rosen's Expert Witness Report ("Rosen Rep.") at 6). Defendants argue that Rosen is not qualified to testify that the rheology or color of the floor stripper would have prevented Ms. Hamraz's injury because he lacks expertise on floor strippers (Def.'s Mem. at 13–14) and human factors, or "the study of how people interact with their environment" (*id.* at 18 n.2).

#### i. Qualification Standards

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). "[T]he expertise and area of proffered opinions should be closely related." *In re M/V MSC FLAMINIA*, No. 12 Civ. 8892, 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017) (citing *Tin Yat Chin*, 371 F.3d at 40). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks

6

expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)). Instead, courts find that "through reading, calculations, and reasoning from known scientific principles," a person may demonstrate expertise in a particular product even when they lack actual experience manufacturing that product. *Lara*, 174 F. Supp. 3d at 730 (quoting *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd sub nom.*, *Lappe v. Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996)).

### ii. Rosen's Qualifications

Rosen has academic and professional experience as a chemist and chemical engineer. Rosen received a Bachelor of Science in chemical engineering from the Polytechnic Institute of Brooklyn in 1964, and a Master of Science in chemical engineering from the same institution in 1966. (ECF No. 96-10, Expert Witness Disclosure at 21). Early in his career, Rosen conducted research on water-soluble polymers and ran safety seminars on the handling of hazardous chemicals. (*Id.* at 23–24). Since 1992 to the present, Rosen has served as an expert witness on the application of chemistry and chemical engineering technology to consumer and industrial products relative to safety issues. (*Id.* at 22–23). Thus, he has more than forty years of industrial and academic experience in the fields of chemistry and chemical engineering, including concerning products liability and personal injury vis-à-vis consumer, household, and industrial products (*id.* at 19), as well as relating to hazardous chemicals, toxic and chemical exposures, chemical burns, and identifying safer alternatives. (*Id.* at 20).

In addition, Rosen's curriculum vitae identifies various professional credentials. For example, he lists certifications in chemistry, engineering, fire investigation, and forensic examination (*id.*); participation in more than a dozen professional associations (*id.* at 25–26);

nine awards and acknowledgments (*id.* at 26–27); nearly fifty presentations at technical conferences and continuing legal education courses (*id.* at 30–36); and about forty technical articles (*id.* at 36–39). He also edited two books and two book series, and co-authored "Handbook of Rheology Modifiers - Practical Use and Application," which was published in 1999. (*Id.* at 28).

During his deposition, Rosen elaborated on his experience as it relates to the current litigation. (*See generally* ECF No. 96-19 at 32–79 (Deposition of Meyer R. Rosen ("Rosen Dep.") at 1–192)).[3] He indicated that in his current position as President and sole employee of Interactive Consulting, Incorporated, about seventy five percent of his work is comprised of forensic litigation consulting. (ECF No. 96-19 at 34 (Rosen Dep. at 9–11)). In this capacity, Rosen has been deposed somewhere between twenty and fifty times (*id.* at 33 (Rosen Dep. at 7)). In the four years prior to Rosen's deposition, he provided testimony in two cases, one of which dealt with "[c]hemical burns from a drain cleaner containing sodium hydroxide" and the other with a slip and fall caused by "[s]omething about the surface of the floor in the location that it occurred." (*Id.* at 36 (Rosen Dep. at 18–20)). Although Rosen has not worked with floor stripping products, he has "worked with solvents . . . . [s]ome of which are typical of what is in [Bright Blast]." (*Id.* at 42 (Rosen Dep. at 41–42)).

The Court finds that Rosen is qualified to opine about Bright Blast's rheology. Despite Rosen's lack of expertise or experience with floor strippers, his educational and professional background in chemistry, chemical engineering, including chemical burn injuries and product safety qualify him to provide testimony in this case as to safer rheological properties. *See Lara*,

---

[3] Although Defendant submitted excerpts from Rosen's deposition transcript (*see* ECF No. 96-11, Defendant's Exhibit H), the Court instead cites to Plaintiff's exhibit, which includes the entire deposition transcript (*see* ECF No. 96-19). When citing to Rosen's deposition, both the ECF-assigned page number and the deposition transcript page number are listed.

8

174 F. Supp. 3d at 732 ("[C]ourts have found that a lack of specific familiarity with a product, machine or specific field does not, in itself, render an expert unqualified to proffer their opinion.") (collecting cases); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 242 (E.D.N.Y. 2014) (concluding that an expert's "lack of knowledge and experience [about a particular product] goes to the weight of [their] testimony" rather than its admissibility).

However, Rosen's expertise and experience do not qualify him to testify with respect to the product's color or its visibility to users or bystanders. In support of his qualifications to offer opinions about Bright Blast's color, Plaintiffs contend that Rosen's opinion is grounded in "common sense,'" (ECF No. 96-17, Plaintiffs' Memorandum of Law ("Pls.' Mem.") at 21), and concede that "an expert is unnecessary to bring a jury's attention to a commonly accepted tid-bit of everyday human knowledge known by all" (*id.* at 22 (citation omitted)). Because an expert witness is only warranted when their testimony will assist the jury, *see* Fed. R. Evid. 702, and because Rosen's curriculum vitae and deposition testimony are silent as to any "superior knowledge, education, experience, or skill" in the use of color as a warning or signal of danger (*see* ECF No. 96-19 at 74–76 (Rosen Dep. at 169–78)), or the use of color in floor strippers (*id.* at 74–75 (Rosen Dep. at 171–73)), the Court finds that Plaintiffs have failed to establish Rosen's qualifications to opine about Bright Blast's color.

### b. Rosen's Testimony is Not Reliable

#### i. Reliability Standards

When evaluating the reliability of expert testimony, courts may consider: (1) whether the theory or technique can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or published; (3) the known or potential error rate, in the case of a scientific technique, and the existence and maintenance of standards controlling the technique's

9

operation; and (4) whether the theory or technique enjoys general acceptance. *Daubert*, 509 U.S. at 593–94. The district court's inquiry is "flexible" and the "*Daubert* factors are neither exclusive nor dispositive." *Raniere*, 2019 WL 2212639, at *5; *see Hilaire*, 54 F. Supp. 3d at 243 ("[T]hese guidelines must be applied with flexibility, particularly when the expert is offering opinions based on specialized personal knowledge rather than scientific studies." (citations omitted)). Notwithstanding this inquiry's flexibility, when determining whether expert testimony is reliable, the court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Indeed, "[e]xpert testimony should be excluded if it is 'speculative or conjectural,' or if it is based on assumptions that are . . . in essence an 'apples and oranges comparison.'" *Sorto-Romero v. Delta Int'l Mach. Corp.*, No. 05-CV-5172 (SJF) (AKT), 2007 WL 2816191, at *5 (E.D.N.Y. Sept. 24, 2007) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Importantly, "[t]he burden of establishing the reliability of an expert's theories pursuant to . . . Rule 702 and *Daubert* falls squarely with the proponent, who must establish reliability by a preponderance of the evidence." *Lara*, 174 F. Supp. 3d at 734 (citations omitted).

"In a products liability action, 'the "touchstone" of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs.'" *Id.* at 736 (quoting *Hilaire*, 54 F. Supp. 3d at 244; citing *Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475 (ILG), 2005 WL 387660, at *5 (E.D.N.Y. Feb. 11, 2005)). "This utility versus cost comparison should entail the testing of any proposed alternative design." *Id.* (citations omitted). In the Second Circuit, "[t]he failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony." *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (citations

10

omitted); *see Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) ("Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.") (collecting cases)); *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003) ("In analyzing the reliability of an expert's testimony, the 'key question' is 'whether it can be (and has been) tested.'" (quoting *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001))).

      ii.   Reliability of Rosen's Testimony

Rosen's expert opinion with respect to Bright Blast's defective design is relegated to two sentences in a barely six-page report:

> Ecolab could have formulated a safer alternative by incorporating a polymer that would "thicken" (i.e. increase the rheological properties) so the liquid would not flow across the floor until a force was applied. They could also have added a coloring dye so that where it was on the floor was easily visible not only to the person applying the product but to bystanders as well.

(Rosen Rep. at 6). Nonetheless, during Rosen's deposition, he testified that the report contained "all of the opinions" he has related to this case. (ECF No. 96-19 at 51 (Rosen Dep. at 77)).

His report indicates that, in rendering his opinion, Rosen relied on "documents provided by [Plaintiffs' counsel] with reference to [this] matter along with research [he] independently conducted" as well as his "extensive experience in chemistry, chemical engineering, materials science, safety engineering and product design, hazardous materials, corrosive chemicals and chemical burns." (Rosen Rep. at 1–2). The documents pertaining to this case that he reviewed included: Bright Blast safety data sheets (ECF No. 96-19 at 64 (Rosen Dep. at 57)); photographs of the Bright Blast box (*id.*); photographs of the Sears scene of the injury (*id.*); Chavez's accident report (*id.* at 47 (Rosen Dep. at 62)); Nassau University Medical Center hospital records (*id.* (Rosen Dep. at 63)); housekeeping services agreement between Sears and Diversified (*id.* (Rosen

11

Dep. at 63–64)); six transcripts from deposition with Ms. Hamraz, Chavez, Plaintiffs' daughter, two police officers, and a medical technician (*id.* at 47–48 (Rosen Dep. at 64–65)); and photographs of Ms. Hamraz's injuries (*id.* at 48 (Rosen Dep. at 66)).

However, Rosen did not indicate how he used his experience or chemical engineering expertise to render his opinion. Although Rosen testified that he reviewed scientific chemical websites for two solvents (*id.*), his own rheology modifier handbook published in 1971 (*id.* at 49 (Rosen Dep. at 69)), and "several articles" on "sodium hydroxide behavior and effect on skin," (*id.* (Rosen Dep. at 70)), his report lacks citations to specific publications and fails to otherwise indicate how he applied the information in these websites or unspecified articles to reach his conclusions (*id.* at 50 (Rosen Dep. at 73–76); *see generally* Rosen Rep.).

Further, Rosen's testimony has not satisfied any of the four *Daubert* factors. First, Rosen testified that he did not conduct any studies or tests in connection with rendering his opinion and gave no indication that his alternate design has been otherwise tested, or subject to peer review or publication. (ECF No. 96-19 at 51, 73, 74 (Rosen Dep. at 79, 167, 172)). Instead, he based his opinion about Bright Blast's rheological properties on his knowledge of the surface tension of the two solvents used in Bright Blast, since he lacked information about Bright Blast's own surface tension, let alone its surface tension when diluted with water, as it was when Ms. Hamraz was injured. (*Id.* at 69 (Rosen Dep. at 149–51)). He based his opinion about the color of Bright Blast on his human intuition (*Id.* at 71 (Rosen Dep. at 158–59)), which he was unable to supplement with specific information about what dye should be used (*Id.* at 71, 74 (Rosen Dep. at 158–59, 170–71)). Further, Rosen did not point to any existing floor strippers that possess the rheological characteristics or color that he proposed. (*Id.* at 73 (Rosen Dep. at 167)). Although he pointed to the section of his handbook concerning industrial floor *cleaners* used on tiles (*id.* at

71–72 (Rosen Dep. at 160–61)), as he acknowledged, these formulas were not included in his expert report (*id.* at 72 (Rosen Dep. at 161)). Lastly, not only was Rosen's report and deposition devoid of an alternate floor stripper formula (*id.* at 71 (Rosen Dep. at 159)), but he did not present any publications or other documentation to demonstrate that his suggested alterations would be generally accepted in the industry (*see id.* at 73 (Rosen Dep. at 167)).

Finally, Rosen does not offer sufficient analysis of the utility or cost of designing a floor stripper with his proposed rheological properties. Although Rosen testified that changing the rheological properties of the floor stripper would not change its utility (*id.* at 72–73 (Rosen Dep. at 162–63, 165)), he was unsure as to whether adding a dye would stain a floor (*id.* at 74 (Rosen Dep. at 170–71), and was unable to describe with any specificity how either of his proposed alterations would affect cost (*id.* at 75–76 (Rosen Dep. at 176–78)).

Accordingly, Rosen's testimony is not reliable.[4]

    c. Rosen's Testimony is Not Relevant

        i. Relevance Standards

When considering whether expert testimony is relevant in a defective design case, the Second Circuit has concluded that "relevant testimony . . . must . . . establish that [a] hypothetical design would have resulted in greater safety in the . . . accident at issue." *Zaremba*, 360 F.3d at 359 (finding that expert testimony was not relevant when the proposed alternative automobile design would have allowed greater performance but not necessarily greater safety in a rollover

---

[4] Plaintiffs argue, without citing case law or statutory authority, that Defendant's failure to produce a rebuttal expert witness is procedurally deficient (*See* Pls.' Mem. at 3–6, 11–12), and allows the Court to infer that Rosen's opinion is correct (*id.* at 7). This argument lacks merit. *See Brooks*, 234 F.3d at 91 (discussing the court's gatekeeping role as set out by *Daubert* and *Kumho Tire*, and finding no requirement therein that a party challenging the admissibility of an adversary's expert witness must present their own expert).

accident); *Urena v. ConAgra Foods, Inc.*, No. 16-CV-5556 (PKC) (LB), 2020 WL 3051558, at *9 (E.D.N.Y. June 8, 2020) (finding testimony was not relevant when an expert's "proposed alternative design . . . would have made no actual difference with respect to the accident at issue"). Put another way, relevant expert testimony in a design defect case "must show a causal connection between the product defect and the plaintiff's injury." *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491, 495 (E.D.N.Y. 2002); *see also* Fed. R. Evid. 401 ("[e]vidence is relevant [when] it has any tendency to make a fact more or less probable than it would be without the evidence").

ii. Relevance of Rosen's Testimony

Rosen's proffered opinions are not relevant because they fail to show that changing the floor stripper's rheological properties or its color would have prevented Ms. Hamraz's injuries. Rosen testified that Ms. Hamraz's injuries would not have occurred had the floor stripper been formulated differently with respect to its "flow behavior" and color. (ECF No. 96-19 at 71 (Rosen Dep. at 158)). In his expert report, Rosen posited that a polymer should have been incorporated into the floor stripper to increase its surface tension thereby preventing it from spreading to unintended areas, and that a coloring dye could have been added to make the stripper more easily visible. (Rosen Rep. at 6).

However, there is no evidence that Ms. Hamraz was injured because the floor stripper spread to an unintended area. During his deposition, Rosen was unable to point to any testimony that the floor stripper spread beyond where it was meant to go (ECF No. 96-19 at 69 (Rosen Dep. at 151–52)), nor did he know whether Ms. Hamraz fell after stepping in an area where the stripper had been intentionally applied or in an area where it had spread (*id.* at 78–79 (Rosen Dep. at 187–89)). Moreover, although Rosen indicates that Bright Blast's lower surface tension allows it to

14

spread *faster*, he did not suggest that a higher surface tension, as he proposed, would prevent spread altogether, intentional or otherwise. (*See id.* at 69 (Rosen Dep. at 151)). Plaintiffs seem to argue that any floor stripper that extended beyond the "darker-dirtier" rectangular area of the floor on which Ms. Hamraz fell *must* have been due to unintended spread. (*See* Pls.' Mem. at 17–18). This assumption is not, however, substantiated by the record.[5] (*See* ECF No. 96-19 at 69 (Rosen Dep. at 152) (unable to point to any testimony on the record that the product went beyond where it was intended to go); *id.* at 78–79 (Rosen Dep. at 187–89) (offering only that Ms. Hamraz "stepped into something slippery," but unable to say whether it was an area on which floor stripper had been intentionally applied)).

Plaintiff likewise failed to show that Ms. Hamraz was injured because of the floor stripper's lack of color. Rosen's opinion that "th[e] incident would not have occurred if the material was not clear" (*id.* at 74 (Rosen Dep. at 172)) is belied by Ms. Hamraz's own testimony that when she slipped, she was only paying attention to moving the fixture, and looking forward, rather than to the floor, in order to keep her hold on the fixture while she moved it (ECF No. 96-7, Deposition of Qudsia Hamraz, at 23).

Accordingly, because Rosen's opinions do not show that an alternative design incorporating a higher surface tension or tinted dye would have prevented Ms. Hamraz's injuries, his testimony with respect to an alternative design is not relevant.

***

---

[5] Plaintiffs point to a video recording of the incident and photographs of the incident's location as evidence of Bright Blast's unintended "over-spread." (Pls.' Mem. at 17–19; *see* ECF Nos. 96-21 at 415–18 (four photographs of Sears), 96-22 (placeholder exhibit accompanied by duplicate thumb drive of Sears video)). Setting aside the likely inadmissibility of the photographs (*see* ECF No. 96-25, Ecolab Inc.'s Reply Memorandum of Law in Support of its Combined Motion to Exclude Expert Testimony of Meyer R. Rosen and for Summary Judgment at 5–6), these submissions do not show how much, if any, of Bright Blast's spread was due to its rheological properties or surface tension, and thus, do not support a finding that Rosen's testimony is relevant.

For these reasons, the Court grants Defendant's Motion to Exclude Expert Testimony.[6]

II.     Summary Judgment

Defendant moves for summary judgment arguing that "without admissible expert testimony, Plaintiffs cannot maintain a design defect claim . . . [and] even with expert testimony, Plaintiffs cannot prove causation," as needed to establish liability. (Def.'s Mem. at 4). Plaintiffs in turn oppose Rosen's exclusion and seek partial summary judgment against Defendants "on the limited issue of the product's defect," while reserving issues of proximate causation and damages for trial. (Pls.' Mem. at 6).

  A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to material fact exists when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that no material fact is in dispute. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The burden then shifts to the nonmoving party, who must present specific evidence from the record to establish the existence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Celotex Corp.*, 477 U.S. at 323. Importantly, "the mere existence of *some* alleged factual dispute between the

---

[6] Defendant also seeks to exclude Rosen's testimony asserting that Ecolab owed a duty to provide a safe alternative to Brightblast. (Def.'s Mem. at 7–8). As Defendant correctly notes, "[t]he existence of a duty is a question of law to be decided by the court." *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997). Further, the Second Circuit "require[es] exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Accordingly, the Court must exclude Rosen's testimony pertaining to Ecolab's alleged duty.

parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

To prevail, the nonmoving party must also have established each element of their case. *See Celotex Corp.*, 477 U.S. at 317 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial[.]"); *Crawford v. Franklin Credit Management Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's case." (quotation marks, citation, and brackets omitted)).

When adjudicating a motion for summary judgment, courts must review evidence in the light most favorable to the nonmoving party, as well as draw all reasonable inferences and resolve ambiguities in their favor. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In so doing, a court may only consider admissible evidence, and must refrain from considering any expert testimony that it has found to be unreliable or otherwise inadmissible. *Urena*, 2020 WL 3051558, at *11 (citing *Hilaire*, 54 F. Supp. 3d at 251).

B. <u>New York Products Liability</u>

New York law allows a plaintiff to assert claims for injury due to an allegedly defective product under theories of negligence, strict liability, and breach of express or implied warranty. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (N.Y. 1983). "In order to make out a prima facie case on any of these four theories, the plaintiff must show that the product at issue was defective, and that the defectively designed product was the actual and proximate cause of the plaintiff's injury." *Hilaire*, 54 F. Supp. 3d at 252 (citing *Voss*, 59 N.Y.2d at 107–09; 89 N.Y.

17

Jur.2d Products Liability § 2). Here, although Plaintiffs raised claims grounded in theories of strict liability and negligence, because "New York courts have treated the differences between negligence and strict liability as inconsequential," *Saladino v. Stewart & Stevenson Servs., Inc.*, No. 01-CV-7644 (SLT), 2007 WL 4285377, at *5 (E.D.N.Y. Dec. 3, 2007) (citations omitted), these claims are treated together.

New York courts recognize three categories of product defects: (1) manufacturing defects; (2) warning defects; and (3) design defects. *Voss*, 59 N.Y.2d at 107–09; *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir. 1997). Plaintiffs allege that Ms. Hamraz's injuries were caused by a defective product design.[7]

### C. Design Defect

To establish the existence of a design defect, a plaintiff must show that "(1) the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing plaintiff's injury." *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898 (RRM) (CLP), 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 15, 2009) (citing *Voss*, 59 N.Y.2d at 109–10; *Gonzalez v. Delta Int'l Mach. Corp.,* 307 A.D.2d 1020, 1021 (2d Dep't 2003)).

To meet the second element, "the plaintiff must show that there was an economically and technically feasible alternative design available at the time the product was manufactured." *Hilaire*, 54 F. Supp.3d. at 252 (citing *Ruthosky v. John Deere Co.*, 651 N.Y.S.2d, 717, 719 (3d Dep't 1997)). Under New York law, a plaintiff must establish the feasibility and efficacy of

---

[7] Through a process of elimination, and because "the only opinions offered by Plaintiffs and their expert in this case regard reformulating the product," Ecolab concluded that Plaintiffs only allege a design defect claim. (Def.'s Mem. at 5–6). Given the absence of any opposition from Plaintiffs, or evidence establishing other products liability claims, the Court agrees with Defendant and proceeds accordingly.

18

alternative designs through expert testimony. *Id.* (citations omitted); *see Cuntan*, 2009 WL 3334364, at *6 (collecting cases); *Rypkema*, 263 F. Supp. 2d at 692 (noting that a plaintiff may meet this burden in two ways: (1) an "expert [who] can show, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative;" or (2) an "expert [who] can identify makers of similar equipment who have already put into use the alternative design that has been proposed"). Accordingly, "[w]hen the plaintiff does not present any 'admissible expert evidence as to design defect or feasible alternative design, its products liability claims necessarily fail.'" *Urena*, 2020 WL 3051558, at *12 (quoting *Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9, 15 (2d Cir. 2019) (summary order)).

In this case, the Court has found that Rosen is unqualified to offer testimony regarding Bright Blast's color or tint, and that his proffered opinions and testimony about both color and rheology lack reliability and relevance, such that they are inadmissible as evidence of the floor stripper's allegedly defective design. Without another expert in Rosen's place, Plaintiffs are unable to prove that the floor stripper was defectively designed under New York law.[8] Lacking such expert testimony, the Court finds that no genuine issue of material fact exists, and that Plaintiffs' claims

---

[8] Even if the Court had found Rosen's testimony admissible, his failure to offer an economically and technically feasible alternative design nonetheless falls short. Rosen neither tested nor constructed an alternate floor stripper with the rheological or color properties he proposed (ECF No. 96-19 at 74 (Rosen Dep. at 172)), he was unable to detail the cost implications of his recommended alterations (*id.* at 75–76 (Rosen Dep. at 176–78)), and he could not identify any floor stripper already manufactured or on the market that possessed such characteristics (*id.* at 73–75 (Rosen Dep. at 167, 169, 172–73)). Thus, even if his testimony were admissible, the Court would still be unable to conclude that the floor stripper's design was defective.

19

based on design defect must fail.[9] *See Urena*, 2020 WL 3051558, at 13; *Lara*, 174 F. Supp. 3d at 741; *Hilaire*, 54 F. Supp.3d. at 252.

## CONCLUSION

For the reasons set forth above, Defendant's Combined Motion to Exclude Plaintiffs' Expert Testimony and for Summary Judgment is granted, and Plaintiffs' Cross-Motion for Partial Summary Judgment is denied. The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

Hon. Ramon E. Reyes, Jr.
Digitally signed by Hon. Ramon E. Reyes, Jr.
Date: 2023.08.14 14:40:35 -04'00'

RAMON E. REYES, JR.
United States Magistrate Judge

Dated: August 14, 2023
Brooklyn, NY

---

[9] Because Ms. Hamraz's design defect claim against Ecolab is dismissed, the Court likewise dismisses Mr. Hamraz's derivative claim for loss of consortium. "A claim for loss of consortium or services is a derivative action, and in the common law of New York, does not exist independent of the injured spouse's right to maintain an action for injuries sustained." *Urena*, 2020 WL 3051558, at *15 (quoting *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 260 (E.D.N.Y. 2014)); *see, e.g., Liff v. Schildkrout*, 49 N.Y.2d 622, 632, 404 N.E.2d 1288, 1291 (1980) (treating a spouse's cause of action for loss of consortium as a derivative action).

20